SEARS, ROEBUCK & Co., et al. *v.* STATE BOARD OF OPTOMETRY.

Mar. 17, 1952.

No. 38299 (57 So. (2d) 726)

Barnett, Jones & Montgomery, for appellants.

712

Richard A. Billups, Jr., for appellee.

**Ethridge, J.**

In January, 1951 the State Board of Optometry filed a bill of complaint against Sears Roebuck and Company, charging it with the unlawful practice of optometry in its Jackson, Mississippi, retail store, in violation of Code of 1942, Secs. 8832-8846. Subsequently in March, 1951, the Board filed an amended bill of complaint, adding as a defendant Craftsman Optical Company, a Louisiana corporation qualified to do business in Mississippi.

Sears Roebuck and Company operates a large retail store on North State Street in Jackson. From June 15, 1950 to January 1, 1951, Sears leased to Craftsman Optical Company, a defendant, designated a "licensee", 219 square feet of floor space in its Jackson retail store, for the merchandising and sale of optical goods. Under that lease Craftsman agreed to have a graduate optometrist in charge of the department at all times. Sears was to receive as rent 25 per cent. of the net sales of that department, and was to operate the optical goods department as a department of Sears' store. It was stipulated that Dr. Carey S. McAlister, an optometrist licensed with

the State Board of Optometry, had a verbal agreement with Craftsman Optical Company, effective June 15, 1950, under which Dr. McAlister worked in the optical department located at Sears' store and was paid $90 per week, plus 2 per cent. of the gross sales made by Craftsman. This employment and salary arrangement continued from about June 15, 1950 to January 1, 1951. During this period, McAlister was clearly an employee of Sears and Craftsman.

On December 6, 1950, the secretary of the Mississippi Optometric Association, Dr. W. F. Clarke, filed with the State Board of Optometry a complaint charging that Dr. McAlister was practicing as an optometrist in violation of law through a corporation, Sears Roebuck and Company, and was aiding the corporation to unlawfully practice optometry in Mississippi; and that, therefore, the State Board should revoke the license of Dr. McAlister after due notice and hearing. It was stipulated at the time of the trial of this case on March 28, 1951, that the charges filed against Dr. McAlister were then pending before the State Board, and that the charges were being held in abeyance by agreement of counsel to await the outcome of the present suit.

After these charges of December 6, 1950, were filed against Dr. McAlister, and on January 1, 1951, Sears, Craftsman, and McAlister reorganized the arrangement of their business relationships. On that date, January 1, 1951, Sears executed to McAlister a lease of approximately 200 square feet of space in its retail store on North State Street in Jackson, "of the dimensions and at the locations as designated from time to time by Landlord." The lease was to run for one year. McAlister was to use the space "as an optometric office and examining room, and for the preparation, sale, and servicing of optical goods * *." He was to pay rent for this space in Sears' store of $200 per month, and agreed to equip his rented premises with modern and proper equipment for the practice of "tenant's profession and the conduct

of tenant's business". The lease provided that McAlister would post and maintain a sign at the entrance to his premises identifying it as the location of his optometric office and examining room. He was to carry various types of liability insurance. Paragraph 9 of the lease stated: "Tenant shall conduct the said optometric office and examining room in accordance with the laws and ordinances relating thereto and in conformity with the ethics of Tenant's profession, it being expressly understood and agreed that Tenant shall have the sole right and authority to fix the prices or charges for Tenant's services, to collect the same and to settle all controversies with Tenant's customers or patients, to maintain Tenant's own records and to conduct said optometric office and examining room independently and free from the exercise of any control whatever by Landlord." Either party could terminate the lease upon thirty days written notice. The leased property could not be subleased without the written consent of Sears.

On the same day of the lease from Sears to McAlister, the latter partly executed a sublease to Craftsman Optical Company, leasing to it approximately 150 square feet of space in Sears' store, for a period of one year at a rental of $600 per month to be paid by Craftsman to McAlister. The rental stated in the original sublease was $400 per month, but on March 26, 1951, the original sublease was amended to change the rental to $600 per month. The amendment of March, 1951 recited that:

"Whereas, it was the intent and understanding of the parties at the time of execution of said sublease that the net rental payable to Lessor (McAlister) by Lessee (Craftsman) after payment therefrom by Lessor of the rental of Two Hundred Dollars ($200.00) per month payable by Lessor to Sears, Roebuck and Co., Lessor's landlord, would be Four Hundred Dollars $400.00) per month and the parties hereto have acted in accordance with said intent and understanding; and

"Whereas, it is desired to reform said sublease agreement dated January 1, 1951, so as to correct the sum payable by Lessee to Lessor as rental pursuant thereto so as to conform with the intent and understanding of the parties."

The March, 1951 amendment then provided that the rent was $600 "effective from and including the first day of January 1951". It will be noted that under the altered arrangement, Dr. McAlister was to receive a fixed or "net" profit of $400 per month from the new arrangement, and that this was approximately the same amount as the monthly salary which he had received from Craftsman prior to January 1, 1951.

In addition to the January, 1951 lease from Sears to Dr. McAlister, and the sublease from McAlister to Craftsman, there were two other contracts. The first one was between Craftsman and Sears, by letter from Craftsman to Sears dated January 10, 1951. By that contract Sears agreed to handle all sales of merchandise made by Craftsman in its optical department located in Sears' store, through Sears own books and records, just as if such sales were made by Sears. Sears agreed to receive all cash represented by sales and all accounts receivable the same as if these items had resulted from sales by Sears' own organization. Sears was to hold the cash items for Craftsman's account. The "employee in charge" of Craftsman's "Optical Dispensary" would turn over to Sears at the close of each business day all cash receipts and all accounts receivable and other records. Sears agreed to keep a record of this business, and to have its credit department pass upon all credit risks. At the end of each week, Sears would account to Craftsman for all cash received, less the hereinafter stated amount which would be deductible. In consideration of these services by Sears, Craftsman agreed to pay to Sears 25 per cent. of its gross sales, made from Craftsman's optical dispensary "less an amount equal to $400.00 per month (the last mentioned amount of $400.00 per month being the

monthly rental we are required to pay to Dr. McAlister for our sublease).''

Sears was authorized to deduct from its remittances to Craftsman its 25 per cent. of the gross sales, less the rent which Craftsman was paying to McAlister. In other words, Craftsman paid to Sears under the new arrangement 25 per cent. of its gross sales as the consideration for Sears handling the sales accounts of Craftsman. Under the old arrangment of the lease directly to Craftsman, Craftsman paid Sears 25 per cent. of the gross sales, and Sears also handled the sale accounts. Under the new set-up, Craftsman obtained a credit on this charge of Sears, 25 per cent. of gross sales, in the amount of the rent which Craftsman paid to McAlister for its sublease.

A second contract made by Craftsman was with Dr. McAlister, under which McAlister agreed to ''show our merchandise and handle the clerking functions in the department'' of the optical dispensary of Craftsman. That contract, reflected by a letter from Craftsman to McAlister dated January 10, 1951, recited that Craftsman's Optical Department was so small at that time as not to require the full time services of an employee, and that since McAlister would be on a portion of the leased premises, he would aid Craftsman in the dispensing of optical goods ''at least temporarily until the department's business grows large enough to warrant a full time employee * * *.'' That letter does not reflect that Craftsman paid McAlister any specific compensation for those services.

Sometime in January, 1951, there was placed on the wall of Dr. McAlister's office space a small sign reading ''examination fee—$3.00'', just under McAlister's license to practice optometry. It was stipulated that McAlister was the only person working in the leased space, consisting of his office and of the Craftsman Optical Dispensary; and that ''Craftsman is the trade name of a number of items sold by Sears, Roebuck and Company''. The record does not reflect whether appellant, Craftsman

Optical Company, is a corporate subsidiary of appellant, Sears, Roebuck and Company.

At various times in 1950 Sears ran advertisements in the Jackson newspapers. They were billed to and paid by Sears, who later charged their costs to Craftsman. They were run under the name of "Optical Department, Sears, Roebuck and Company." One typical advertisement welcomed the public to Sears' new optical department where the public would receive "a *thoro* eye examination by a registered optometrist, visual analysis * * * glasses compounded," etc. In one corner of the advertising was printed the following: "Dr. C. S. McAlister, Registered Optometrist in Charge, Full time office at the Optical Dept. Long experienced in practice of examining eyes for glasses in Mississippi, Dr. Carey S. McAlister personally invites you to come in for a visit at your convenience." Since January 18, 1951, Sears has published no advertisements of the optical department. Dr. McAlister has run them individually. Several pictures of the space leased by Sears to McAlister and subleased by McAlister to Craftsman appear in the record. One of these photographs indicates that McAlister's office and the optical dispensary are very close to the men's clothing department and other quarters in the Sears' store containing general merchandise, and that they are physically integrated with the other merchandising parts of the store.

Only two witnesses testified, and both of them were presented by appellee, complainant below, State Board of Optometry. The first witness was Miss Katherine Hornsby. On December 4, 1950, Miss Hornsby was working as a Secretary for the attorney of appellee Board. At his request, she went to the optical department at Sears, and advised Dr. McAlister that she needed some glasses. She then said: "He examined my eyes and told me I had a slight defect there and he thought glasses might correct it. He wrote the prescription and I asked him if he would give me the prescription and let me

think about getting the glasses and take it home with me. He said he couldn't give me the prescription but he wrote it out on a little piece of paper.'' She stated that McAlister said that he could not give her the prescription which he had written, but upon her insistence he finally handed her a piece of paper purporting to be a prescription. It apparently was written on the back of a torn check. It contained her name, but not the doctor's name, and had some letters and figures on it. She later returned to Dr. McAlister, when he showed her some frames and measured her head for them. She paid him $31.78 for the glasses, and he gave her a receipt for that payment evidenced by a Sears' sales ticket. She tried to wear the glasses but they caused a blur and gave her a headache. With reference to whether McAlister charge a fee for his services, Miss Hornsby said that he told her there would be no fee, that he felt that if she had the prescription filled, she would let them do it. And the sales ticket reflects a charge only for the glasses.

The other witness for complainant was Dr. C. R. Von Seutter, a registered optometrist practicing in Jackson. He examined Miss Hornsby's eyes, but the court excluded his testimony, which appellee stated would be that in fact Miss Hornsby did not need glasses of any kind at the time McAlister sold them to her.

The chancery court in its final decree enjoined Sears and Craftsman from the practice of optometry ''directly or indirectly, and from employing, by any means, registered optometrists or physicians and surgeons to examine the eyes of their customers and prescribe eye glasses in the State of Mississippi.''

In a clear and comprehensive opinion the chancellor examined the statutes, and said in part as follows: ''The weight of modern authority is against such arrangements as we have here, and the question presented is whether the optometrist is working for the defendant companies as an employee, or for himself as a licensed and independent practitioner.

"It is only in the latter capacity that his status could be legal and his license authoritative in professional relation and service to the public.

"The statutory edifice, relating to and regulating optometry in the State of Mississippi, excludes all that it does not include, and merchants and druggists are authorized only to sell and assist purchasers in fitting spectacles and eyeglasses over the counter, and in their places of business at the time of sale.

"They are not permitted to hire an optometrist with his license as a screen to hide them from the law while they commercialize the profession, and use him as a handy man to fit and sell glasses as merchandise. In this position the optometrist would be acting as a clerk or salesman, and the employer would in effect be practicing the profession without a license * * *.

"It is alleged in defense that the optometrist in this case is not an employee, but is a lessee or tenant of Sears, * * *.

"Copies of alleged leases, sub-leases, and correspondence agreements, were introduced in evidence to show that the optometrist rents a small space at the Sears' store for $200 a month, and in turn subrents a part of this space to the Louisiana corporation for $600.00 a month, giving the optometrist a net take of $400.00 a month at the very outset.

"The Louisiana corporation is the third party to this triangle, and its business is to supply the glasses which the optometrist sells.

"There are other features of these complicated contracts, with their intricate and interlocking arrangements, that are too involved for detailed comment, and which for the present might be passed over.

"I am of the opinion, from the evidence, that the optometrist is not renting working space as a tenant in the Sears-Roebuck establishment, but is simply occupying it as an employee or clerk, and that the four hundred-dollar net income from the sublease is his assured

salary, plus such additional amounts as may have been agreed upon.

"This is the only reasonable view that the circumstances present * * .*"

Essentially, three questions are involved on this appeal: (1) Whether under the Mississippi statutes a corporation can practice optometry through a licensed employee-optometrist; (2) If the statute prohibits such practice, whether the act is constitutional; and (3) whether there is sufficient evidence in the record to support the finding of fact of the chancery court that Dr. McAlister is an employee of Sears and Craftsman. Our conclusions are that the first question must be answered in the negative and the other two in the affirmative.

The Mississippi Optometry Act was first passed in 1920. Miss. Laws 1920, Chap. 217. With only minor amendments, it is now Code of 1942, Secs. 8832-8846. Sec. 8832 defines the practice of optometry as "the application of optical principles, through technical methods and devices in the examination of human eyes for the purpose of ascertaining departures from the normal, measuring their functional powers and adapting optical accessories for the aid thereof."

Sec. 8833 makes it unlawful for "any person" in this State to practice optometry unless he has first obtained a license from the State Board of Optometry. Under Sec. 8834 a violation of the chapter is a misdemeanor. A State Board of Optometry is created consisting of five citizens appointed by the Governor. Secs. 8835-8839 Sec. 8840 provides: "Any person over the age of twenty-one years, of good moral character, and who has graduated from a high school or preparatory school affiliated with and recognized by a state university, and who has graduated from a reputable school or college of optometry maintaining a two-year course in optometry, each session seven months in length, and offering a course of a standard equivalent to that required by the federal board of vocational training, shall be entitled to stand the exam-

ination for license to practice optometry in Mississippi. * * * The examination to practice optometry shall consist of tests in practical, theoretical and physiological optics, in theoretical and practical optometry and in anatomy and physiology of the eye and in pathology as applied to optometry.''

Under Sec. 8841, every applicant must file with the Secretary of the State Board of Optometry a proper application. The Board may refuse a license or revoke one for stated reasons. Sec. 8845 provides: ''Nothing in this chapter shall be construed as conferring on the holder of any certificate of licensure issued by said board the title of doctor, oculist, opthalmologist, or any other word or abbreviation indicating that he is engaged in the practice of medicine or surgery, or the treatment or the diagnosis of diseases of, or injuries to the human eye, or the right to use drugs or medicines in any forms for the treatment or examination of the human eye.''

We think that the Optometry Act has the effect of prohibiting a corporation from practicing optometry through a licensed employee. This appears to be the legislative purpose. And this conclusion is in accord with the substantial weight of authority from other states as well. 13 Am. Jur., Corporations, Sec. 837, summarizes the rule: ''It is generally held that in the absence of express statutory authority a corporation may not engage in the practice of optometry either directly or indirectly through the employment of a duly registered optometrist.'' See also 41 Am. Jur., Physicians and Surgeons, Sec. 28; 19 C. J. S., Corporations, Sec. 956, pages 411-412; 70 C. J. S., Physicians and Surgeons, Sec. 10, pages 843-844.

The statute requires a practitioner of optometry to be a ''person'', who is over 21 years of age, of good moral character, who has graduated from a reputable school of optometry, maintaining a two-year course, and who has passed the required examination. It is apparent that no corporation is entitled to be registered and to practice

optometry through employees under these requirements. Other courts have reached this same result. In State ex rel. Beck v. Goldman Jewelry Company, 1935, 142 Kan. 881, 51 P. (2d) 995, 102 A. L. R. 334, the Kansas statute was similar in many respects to the Mississippi act, and the Court so held.

The statute in Funk Jewelry Co. v. State ex rel. La Prade, 1935, 46 Ariz. 348, 50 P. (2d) 945, established similar requirements as to who was entitled to practice optometry: He must be over 21 years of age, of good moral character, etc. The Court said: "The qualifications of an optometrist, as thus outlined, of course exclude a corporation from the practice. It cannot qualify and cannot obtain a certificate of registration. It is not of the class of persons the Legislature intended to authorize to practice optometry. It does not possess the necessary moral and intellectual qualities."

To the same effect are Eisensmith v. Buhl Optical Co., 1934, 115 W. Va. 776, 178 S. E. 695; Eddy v. West Virginia Board of Optometry, 1935, 116 W. Va. 698, 182 S. E. 870; State v. Kindy Optical Co., 1933, 216 Iowa 1157, 248 N. W. 332; Anno., 102 A. L. R. 343, 128 A. L. R. 585; Anno., 141 A. L. R. 883, 888 . These annotations also discuss a minority group of cases, such as Silver v. Lansburgh & Bros., 1940, 72 App. D. C. 77, 111 F. (2d) 518, 128 A. L. R. 582, which do not infer from such regulatory statutes a prohibition of a corporation from employing an optometrist to practice optometry.

Appellants argue that the failure of the Legislature to pass bills introduced in both houses in 1950, which among other provisions prohibited the corporate practice of optometry, should be considered in interpreting the 1920 act. But it is impossible to say which of the proposed amendments resulted in failure of the bills to pass. Lane v. Kolb, 1891, 92 Ala. 636, 9 So. 873, 880. That suggestion is of no aid in interpreting this act.

The rationale of the foregoing corporate prohibition is closely related to the legislative purpose and

power of designating optometry as a profession. This clarifies the constitutional validity of the Mississippi statutes based upon the police power of the State. And the great weight of authority holds that the Legislature has the power to define optometry as a profession and to regulate it as such. Anno., 98 A. L. R. 905. Some of the many cases holding that a Legislature has validly classified optometry as a profession for regulatory purposes are State ex rel. Loser v. National Optical Stores Co., 1945, 189 Tenn. 433, 225 S. W. (2d) 263; State ex rel. Sisemore v. Standard Optical Co. of Oregon, 1947, 182 Or. 452, 188 P. (2d) 309; Kendall v. Beiling, 1943, 295 Ky. 782, 175 S. W. (2d) 489; State ex rel. Standard Optical Co. v. Superior Court, 1943, 17 Wash. (2d) 323, 135 P. (2d) 839; Neill v. Gimbel Bros., Inc., 1938, 330 Pa. 213, 199 A. 178; Funk Jewelry Co. v. State ex rel. La Prade, 1935, 46 Ariz. 348, 50 P. (2d) 945; McMurdo v. Getter, 1937, 298 Mass. 363, 10 N. E. (2d) 139. Illustrative of these decisions is State ex rel. Sisemore v. Standard Optical Co. of Oregon, 1947, 182 Or. 452, 188 P. (2d) 309, 312, in which the Court said: "The practice of optometry is undoubtedly one of the subdivisions of the practice of medicine, which have arisen in modern times by reason of the necessity for specialization. It would seem that the public has as much need to be protected from quacks and charlatans in optometry as in dentistry or any other subdivision of medicine. Cf. Semler v. Oregon State Board of Dental Examiners, 148 Or. 50, 53, 34 P. (2d) 311. One who consults an optometrist for ocular examination is entitled to the same undivided loyalty that he should receive from a physician. The fact that the optometrist is the employee of an optical concern whose main interest is the sale of optical goods tends to be a distracting influence which may adversely affect his loyalty to the interests of his patient."

Another aid in determining the professional nature of an optometrist's work under the Mississippi statute is the act upon which this suit is based. Miss. Laws 1946,

Ch. 431, being Code of 1942, Supp., Secs. 8923-51. It authorizes any state board which grants licenses "to practice any profession" to obtain an injunction in chancery against any person practicing without a license. It then states: "The provisions of this act shall not be construed to affect persons practicing chiropractic, drugless healing other than surgery, osteopathic or veterinary science." The exemption does not include optometry.

It is contended that Sec. 8846 exempts appellants from the statute, when it says that "this chapter shall not prohibit merchants and druggists who are actually engaged in business in this state from selling and assisting purchaser in *fitting* spectacles and eye glasses in their place of business at time of sale." However, this exemption is confined to those who sell glasses and fit them in their place of business at time of sale. That involves only the mechanics of sale and fitting glasses under limited circumstances, not the professional functions of an optometrist. It does not exempt Corporations who undertake to employ licensed optometrists to perform optometrical work as included in the act. Moreover, Sec. 8846 as originally enacted confirms this legislative purpose to narrowly limit the exemption. It was Sec. 14, Miss. Laws 1920, Ch. 217, which provided: "The provisions of this act shall not apply * * * (b) to persons selling spectacles and eyeglasses but who do not assume directly or indirectly to adopt them to the eye, or neither practice nor profess to practice optometry." It was amended in Miss. Code 1930, Sec. 5666, which is now Code of 1942, Sec. 8846. The Ohio statute has an exemption provision identical to the original Sec. 14, Miss. Laws 1920, Chap. 217. In Rowe v. Standard Drug Co., 1937, 132 Ohio St. 629, 9 N. E. (2d) 609, 613, it was held that under it an unlicensed optician could not employ a licensed optometrist to do optometrical work, and that the optician was not within the statutory exemption.

The remaining question is whether there is sufficient evidence in the record to support the finding of fact of the chancellor that Dr. McAlister, under his arrangements with Sears and Craftsman, is an employee of Sears and Craftsman. We think there is. The books are replete with cases analyzing attempts to evade the statutory prohibition against a corporation practicing optometry through a licensed employee. ▮▮ ▮ The courts carefully examine the factual relationships of the parties in order to determine whether the prohibited employer-employee relationship exists. We will not again detail the facts. Prior to the new arrangement of January, 1951, McAlister was admittedly an employee of Sears and Craftsman. After the complaint of December, 1950 had been filed against McAlister before the State Board of Optometry, the new arrangement of contractual relations between the parties was made, effective January 1, 1951. The chancellor was warranted in finding that this arrangement was an attempt to evade the statutory prohibition. It took the form of a lease of about 200 square feet from Sears to McAlister for a rent of $200 per month. On the same day McAlister subleased to Craftsman three-fourths of that space for a rental of $600 per month, giving to McAlister an assured net income of $400 per month. Before that time he had been paid a salary of $90 per week; the new arrangement reached approximately the same result. That this arrangement was but a variation upon the prior situation and an evasion was recognized by the contract between Sears and Craftsman, by which Sears was to handle all of the accounts and bookkeeping for Craftsman and Craftsman was to pay Sears 25 percent of its gross sales, but was to obtain credit on that amount for the rental which Craftsman had to pay to McAlister for the sublease. With a minor exception, McAlister had access to his office only during the business hours of Sears' retail store. And Sears could cancel its lease on 30 days' notice. These and the other circumstances support the

finding of the chancery court that in fact McAlister was practicing optometry as an employee of Sears and Craftsman. It is true that McAlister's lease from Sears authorized him to charge a $3 fee for each patient, and that he had a sign in his office to that effect. Miss Hornsby testified that in December 1950, he refused to charge her a fee, but there was no proof that under the January 1951 arrangement McAlister was not charging a separate fee. Yet whether he did or not is simply one circumstance out of many relevant to the major issue of whether McAlister was in fact an employee of Sears and Craftsman.

In State ex rel. Beck v. Goldman Jewelry Co., 1935, 142 Kan. 881, 51 P. (2d) 995, 1001, 102 A. L. R. 334, the Jewelry Company originally employed a licensed optometrist in connection with its optical dispensary, but after protest was made, the defendant company changed its method of doing business and rented to Jacobs, a licensed optometrist, space in its store. Under the contract, Jacobs was to furnish each of the company's customers free optometrical examinations. Jacobs paid rent of $20 a month for his space. The company would pay Jacobs $2.75 for each examination, and Jacobs also had the right to carry on his own practice at the rented location and to retain his own fees. Jacobs was to do the mechanical work of preparing glasses and to receive a commission of 10 per cent. of the gross amount of each sale. Either party could terminate the contract on 10 days' notice. Under the Kansas statute, somewhat similar to that of Mississippi, the Court held that the Goldman Jewelry Company was in fact the illegal employer of Jacobs. The Court said:

"It argues, however, that it changed its method of doing business on July 19, 1935, and that its employee is now a licensee in control of the business and that it has no control over it. A quite similar arrangement was denounced in State v. Kindy Optical Co., supra, and under Eisensmith v. Buhl Optical Co., supra, and our own case of Winslow v. Kansas State Board of Dental Examiners,

supra [115 Kan. 450, 223 P. 308], it would seem a similar conclusion should be reached here. An examination of the contract between the defendant corporation and its employee Jacobs shows the lack of Jacobs' control, for the company can dispense with his services on ten days' notice whenever it concludes he is not producing enough sales of glasses to those referred to him for tests of the eyes. It likewise shows that Jacobs has nothing to do with the prices fixed for sales of glasses, and for his own services to the customer he is paid by the company and not by the customer. There is an entire lack of the relation that ordinarily exists between a professional man and his client. The fact the contract provides that Jacobs must supply and own his examining equipment and may have patients of his own does not cure the faults above noted; the company rather offset any advantage to Jacobs thereunder by requiring him to buy supplies of it, and it requires no statement to the contrary in the contract to inform us that it is at prices fixed by the company.''

In Ritholz v. Arkansas State Board of Optometry, 1944, 206 Ark. 671, 177 S. W. (2d) 410, 411, Ritholz had prior to July, 1940, employed in his optical dispensary a physician. He was paid $40 per week. A later arrangement was outlined by the court as follows: ''The salaried physician (who also maintained an independent office at 319½ Main Street) contracted with Ritholz and his associates, to rent 96 square feet of office space occupied by National, payment to be $35 per month. This contract, prima facie, merely creates the relationship of landlord and tenant. Affirmative expressions were used in a seeming effort to emphasize what the Ritholzs now contend to have been the purpose—that is, merely to provide convenient office quarters for the physician in order that National customers might be accommodated if on their own initiative they elected to have professional assistance in those instances where advice of an optometrist was required. The contract physician testified that he charged $1 for

examinations and received a commission of 20 percent on certain sales of glasses after examinations had been made by him at his office in the adjoining block. Compensation thus realized and that received from his private practice amounted to approximately $500 per month as distinguished from the former salary of $40 per week. He did National's work exclusively.

"We think the case is controlled by Melton v. Carter, 204 Ark. 595, 164 S. W. (2d) 453. In that case constitutionality of Act 94 was upheld. It was also said that the legislative object was to prohibit employment of an optometrist by one who is not licensed. In other words, under that decision, 'a layman may not engage in the profession by employing a licensed optometrist'.

"The decree in the instant case found that the lease agreement was collusive—'A fiction for the agency that exists between the parties', as the Chancellor expressed it. We think the testimony sustains this finding."

Neil v. Gimbel Bros., Inc., 1938, 330 Pa. 213, 199 A. 178, 180, involved a somewhat similar situation. The store leased to Diamond a portion of its floor space for the operation of an optical department. The court there said that when a lease is accompanied with "such control as is here shown, the lessee becomes the agent of defendant, and, as it is forbidden to practice (optometry), it may not do so through agents."

In State ex rel. Bricker v. Buhl Optical Co., 1936, 131 Ohio St. 217, 2 N. E. (2d) 601, the Buhl Optical Company operated an optical dispensary and for a while employed optometrists on a salary. Later the arrangement was changed by a written contract, under which the company leased to several optometrists certain office space in its optical goods store, in consideration of the lessees referring to company patients for whom they prescribed glasses. For examinations the optometrists agreed not to charge more than $1, which fees the optometrists alone received. The court held that this arrangement was a subterfuge and that the optical company was

in effect still the employer of the optometrists and was violating the statute.

In a later Ohio case, Rowe v. Standard Drug Co., 1937, 132 Ohio St. 629, 9 N. E. (2d) 609, 612, the Standard Drug Company and the May Company abandoned the method of operation which had been condemned by the court in the Buhl Optical case. Standard leased floor space to Adelson for an optical department. Adelson subleased a part of the space to an optometrist, with lessor's consent. The sublease was made by Adelson to Dr. Kudysh, who charged all patients who came to him a $1 examination fee, which he retained. At the end of each week, Adelson paid to Dr. Kudysh the difference between the total he received for examination fees for that week and $60, the $60 being the guarantee given by Adelson to Kudysh. Kudysh filled out prescriptions, and informed each patient that he could go to any optician he chose, but that if he so desired Adelson could fill the prescription. Although the court refused to hold the Standard Drug Company and the May Company in contempt, since the proof did not show that they knew of or had aided in the violation of the optometry statute, it held that Adelson and Dr. Kudysh were violating the act. It said that the court "is not limited by the terms of the lease, but will consider the manner in which the optical business was conducted and the extent to which the corporation participated in transactions involving optometrists. * * *

"Of course a lease, valid on its face, may be a mere sham or device to cover up the real transaction; but such a subterfuge will not be permitted to become a cloak for illegal practices. The courts will always pierce the veil to discover the real relationship. Where a corporation directly or indirectly engages in the practice of optometry the lease will afford no protection on a proper challenge of the illegality."

In State v. Kindy Optical Co., 1933, 216 Iowa 1157, 248 N. W. 332, 335, the state sued to enjoin the defendant

corporation from practicing optometry. The company operated stores distributing optical supplies. Earlier, the company had employed Jenson, a licensed optometrist, to manage its optical stores and to also serve as an optometrist therein. After the state had indicated it would take action, the company rearranged its relationships by executing to Jensen a lease of certain floor space in its store building in Des Moines. The lessor company agreed to pay Jensen $281.66 per month. All eye examinations were to be under the exclusive control of lessee. On the same day by a separate contract the company employed Jensen for two years as a manager of its optical department. All monies derived from that business were to be deposited in the name of the company. The company paid Jensen a salary and certain percentages for that work. Advertisements appeared in the name of the company. The court said:

"The subtle attempt on the part of the defendant to evade the provisions of the Iowa statutes in reference to the practice of optometry, by employing a licensed optometrist to conduct its business, and by the execution of the alleged lease with its employee, is too patent to appeal strongly to a court of equity. * * *

"The execution of the so-called lease between the defendant and its employee Jensen, in connection with the contract of employment between the same parties, was also a sham and fraud and a too evident plan, purpose, and intent to evade the provisions of the statutes herein referred to. It is true that the name of the defendant did not appear publicly in connection with the business, but the record shows without controversy that the business was in fact owned and operated by the defendant company. The defendant company controlled the conduct and policies of the business. Jensen was simply its employee on a stipulated salary. The so-called lease between Jensen and the defendant, under the terms of which the defendant, as lessor, was to pay Jensen, as lessee, $281 per month, was only a clever attempt to

change the character of Jensen from an employee to a lessee, and does not change the fact that Jensen was an employee of the defendant company.''

In Ritholz v. Com. of Virginia, 1945, 184 Va. 339, 35 S. E. (2d) 210, 219, the proprietors of an optical store furnished offices to an optometrist and guaranteed him a minimum income. He collected a $2 fee which he retained. He would deliver prescriptions to Ritholz, owner of the optical store. The court discussed a number of cases somewhat similar to the present one, and held that the optometrist was an employee of the store within the prohibitions of the statute; that whether the customers paid a separate fee to the optometrist is not controlling; and that ''the relationship of the parties is not changed by the different methods of payment.''

In State ex rel. Loser v. National Optical Stores Co., 1945, 189 Tenn. 433, 225 S. W. (2d) 263, 266, the store furnished optometrists with a small office inside the building and guaranteed them a fixed minimum weekly income. The optometrists charged a $2 examination fee, which they retained. The court said the activities of the optometrists and the sales of the store were so merged and combined that they constituted a single operation and enterprise; and that the device by which the defendant used the services of the doctors amounted to ''an evasion of the law and is not a bona fide arrangement.'' See also Kendall v. Beiling, 1943, 295 Ky. 782, 175 S. W. (2d) 489; State ex rel. Standard Oil Company v. Superior Court, 1943, 17 Wash. (2d) 323, 135 P. (2d) 839; McMurdo v. Getter, 1937, 298 Mass. 363, 10 N. E. (2d) 139; Anno., 102 A. L. R. 334, 128 A. L. R. 585, 121 A. L. R. 1455, 141 A. L. R. 883, 888.

Affirmed.

**Roberds, Alexander, Lee** and **Arrington, JJ.,** concur.