Neill et al. v. Chaby, etc.

*Nochem S. Winnet* and *Fox, Rothschild, O'Brien & Frankel* for plaintiffs.

*Bertram Bennett* for defendant.

*Henry W. Balka*, amicus curiae.

CRUMLISH, J., June 4, 1953.—Plaintiffs in this action, three graduate doctors of optometry, and the Philadelphia County Optometric Society, which latter organization is composed of graduate optometrists practicing in the City and County of Philadelphia, are before the court to secure equitable relief in the form of an injunction to restrain defendant Charles R. Chaby, trading as Erie Optical Company, from the operation of his optical business.

Plaintiffs aver the following:

1. That defendant, Charles R. Chaby, trading as Erie Optical Co., is engaged in the business of operating optical stores in Philadelphia, and has been engaged in the practice of optometry individually and through his servants, agents and employes at such stores for a long period of time.

2. That defendant has, contrary to the laws of the Commonwealth of Pennsylvania, engaged in the practice of optometry in the following manner:

(a) By holding himself out in advertisements in the Philadelphia newspapers, and by store signs and by word of mouth, as: (1) A person competent to determine by an examination of the eyes, the kind of glasses needed by any person; (2) a person able to examine the eyes of any person for the purpose of fitting the same with glasses; (3) a person who is a lawful holder of a certificate of licensure, and therefore a licensed practitioner of optometry; (4) a person who is capable of protecting the eyes of any persons by fitting them with glasses.

(b) By actual examination of the eyes of persons, for the purpose of fitting same with glasses;

(c) By reserving a portion of the store premises as optical offices, equipped and intended for the examination of the eyes of persons for the purpose of fitting same with glasses.

Plaintiffs aver that all of the aforementioned acts of defendant constitute the practice of optometry as defined by the laws of the Commonwealth of Pennsylvania; that defendant has no right to practice the profession of optometry either directly or indirectly through agents, servants or employes; that he does not hold a license to practice optometry; that defendant's conduct is contrary to the rights of plaintiffs, and also contrary to the public policy and laws of the Commonwealth of Pennsylvania.

Plaintiffs therefore request that the court enjoin defendant from the practice of optometry in any way whatsoever, and that he be enjoined from committing any of the acts complained of above.

Defendant admits that he is engaged in the business of operating optical stores in the City of Philadelphia through his servants, agents and employes. Defendant denies, however, that he is engaged in the practice of optometry in any of the ways complained of by plaintiffs. He admits that he has held himself out, by advertisement and otherwise, as being in the optical business; furnishing persons so desiring with glasses, consisting of lenses and frames, upon prescription of a duly licensed and practicing oculist or optometrist. Defendant also admits that he does not have the right or power under the laws of this Commonwealth to practice optometry; that he is not licensed to practice optometry in Pennsylvania; that optometry is a profession, made so under the laws of the Commonwealth of Pennsylvania, and that he has no right or power directly to practice optometry or indirectly to practice it through servants, agents or employes, or by hiring licensed optometrists to carry on said practice for him, and does not hold himself out as having such right to practice. Defendant denies that his manner of conducting his business in any way degrades the profession of optometry; denies that he

is directly or indirectly and unlawfully practicing optometry or that plaintiffs, the public, and members of the profession of optometry are suffering irreparable injury and damage. Defendant avers that individual plaintiffs have been and are presently committing acts and engaging in practices which are contrary to and in violation of the laws of the Commonwealth of Pennsylvania pertaining to the profession of optometry, and are therefore not entitled to the relief sought in this action.

The issue before the court is:

Has defendant, Chaby, trading as Erie Optical Company, so conducted his business through his servants, agents and employes that he has in fact been practicing optometry in violation of statutory provisions?

## Findings of Fact

1. Plaintiffs John C. Neill, John J. Crozier and Frederick W. Sinn are graduate doctors of optometry and duly licensed by the Commonwealth of Pennsylvania to practice optometry, and by virtue of the license granted to them have been and are presently engaged in the practice of optometry in the City of Philadelphia, maintaining offices for such purposes and have built up practices of value.

2. The Philadelphia County Optometric Society is an association composed of graduate optometrists practicing in the City and County of Philadelphia, interested in and committed to the advancement of the profession of optometry and the protection of the public by preventing incompetent, unlicensed and unauthorized persons from practicing optometry; of which society John J. Crozier is the president and Frederick W. Sinn is the president-elect, who have been authorized by the society to appear for the society and prosecute this suit in its name and in its behalf.

3. Defendant Charles R. Chaby, trading as Erie

Optical Company, is engaged in the business of operating optical stores in the City of Philadelphia, more particularly on the premises No. 2213 North Broad Street and No. 1408 West Venango Street.

4. Defendant does not hold a certificate of licensure to practice optometry in the Commonwealth of Pennsylvania.

5. Optometry and the practice thereof is a profession and is made so by the laws of the Commonwealth of Pennsylvania and defendant has no right or power directly to practice optometry or indirectly to practice it through servants, agents or employes, or by hiring licensed optometrists to carry on said practice for him, nor can be hold himself out as having such right to practice.

6. Defendant in the operation of his business does the following:

(a) Contracts with optometrists to have them examine eyes and prescribe glasses upon his store premises;

(b) Guarantees to such optometrists a minimum weekly salary;

(c) Furnishes most of the equipment used by such optometrists;

(d) Furnishes a room, or a part of a room, on his store premises to such optometrists for use in making examinations;

(e) Instructs such optometrists as to the amount they are to charge for an eye examination;

(f) Instructs such optometrists as to the type of lenses to prescribe;

(g) Specifies hours of work during which such optometrists are to be on the premises, and does not furnish keys to the premises to such optometrists;

(h) Furnishes prescription blanks and other office supplies to such optometrists without charge;

(i) Instructs such optometrists not to apply for branch office licenses;

(j) Does not permit such optometrists to maintain personal signs on the store premises.

(k) Advertises "Glasses—8.75 complete";

(l) Does not mention the name of such optometrists in his advertising;

(m) Does not state that there will be an additional charge for eye examinations in such advertising;

(n) Refers all prescription business to such optometrists and expects such optometrists to refer all glass-making business to defendant wherever possible.

(o) Has the power to dismiss such optometrists from his business place, and

(p) Makes no charge for the use of his premises by such optometrists, and/or enters into collusive lease agreements with them whereby no rent is actually paid.

7. The practice of optometry is regulated by the Act of March 30, 1917, P. L. 21, sec. 1, and its subsequent amendments (63 PS §§231-244).

8. Those dealing with eye care may be classified[*] as follows:

*Ophthamologist:* One skilled in ophthamology, which is the science of the anatomy, physiology, and diseases of the eye;

*Oculist:* Also classified as an opthamologist;

*Optometrist:* One who measures the degrees of visual powers, usually without the aid of a cyclolegic or mydriatic; a refractionist;

*Optician:* A maker of optical instruments or lenses; and

*Dispensing Optician:* One who retails spectacles and ophthalmic lenses.

9. Defendant is engaged in the practice of optometry in the following manner:

---

[*] Blakiston's New Gould Medical Dictionary, The Blakiston Company, Philadelphia, Toronto, 1949.

(a) By arrangements amounting to employment of licensed optometrists who practice their profession upon store premises owned or leased by defendant, and

(b) By reserving a portion of store premises as an examination room, equipped and intended for the examination of the eyes of persons for the purpose of fitting same with glasses.

10. Through advertisements in the newspapers of Philadelphia, and by billboard, store signs, and word of mouth, creates the impression in the public mind that he is a lawful holder of a certificate of licensure.

11. The aforesaid acts of defendant tend to degrade the profession of optometry and are contrary to the rights of individual plaintiffs and all other regularly licensed optometrists, in that the practice of every licensed optometrist in the City of Philadelphia, who by law is qualified and licensed to examine the eyes of persons is harmed thereby.

12. The aforesaid acts of defendant are in violation of Section 1 of the Act of 1917 (as amended), P. L. 21, 63 PS §232.

## Discussion

Defendant designates himself a "dispensing optician" and trades as Erie Optical Company, at 1408 West Venango Street, and 2213 North Broad Street, Philadelphia. He also operates a launderette (which he described as "a series of washing machines where clothes are washed") and a general grocery and delicatessen store in a premises on North Broad adjoining the Venango Street address.

At the Venango Street address, one Dr. Allan Ross, an optometrist, it is alleged "rents a space for the examination of the eyes". Doctor Saltzman, M.D., conducts an oculist's business at the North Broad Street address.

On September 26, 1952, defendant inserted an advertisement in the Philadelphia Inquirer, "Help

Wanted" column, as follows: "Optometrist Wanted. Call Ba 9-0357". Among the persons answering this advertisement were two young optometrists who were just starting out in the profession, Dr. Gilbert Rubin and Dr. Edward A. Sweeney. The latter testified that he answered the aforesaid advertisement by calling the telephone number given therein and was directed to call at the Erie Optical Company on Venango Street, just off Broad. Reporting as directed, he first saw a Dr. Ross on the premises, who referred him to defendant. Defendant then told him that he was opening a new place at Fifty-second and Market Streets; that he needed an optometrist to do refractions; that the charge for eye examinations was to be $3; that his hours were to be 9 a.m. until 9 p.m.; that he guaranteed him 20 refractions a week, or $60 a week; that he was to do no selling of glasses as there would be a woman in to take care of that, and there was no mention of overhead or the furnishing of equipment.

Dr. Rubin testified that he called the telephone number mentioned in defendant's advertisement, reported to defendant at his Broad and Venango Streets place of business, and as a result, worked at the Fifty-second Street address for four days under the following arrangement: His hours were to be from 2 p.m. to 5 p.m. and Friday evenings; the charge for each examination of the eyes was to be $3 and he was guaranteed $35 per week; that there was refracting equipment on the premises but he had the privilege of using his own hand instruments. During the four days he worked under this arrangement he made three or four examinations and defendant paid him $19, "for the number of hours I had put in, less the number of refractions I had made"; that defendant's wife was "stationed" at the office, "and she was to see about the dispensing end of fitting of the glasses."

Defendant, as on cross-examination, testified that Dr. Ross is the lessee of space on the Venango Street

property and produced a writing dated January 2, 1952, signed by defendant and Ross, purporting to be a lease for "all that certain such space in the area on first floor of 1408 W. Venango St., . . . now occupied by Erie Optical Company as shall be designated by the Lessor to the Lessee for examination and refraction but not for the sale of glasses for the term of one year from the 1st day of January A. D. 1952 . . . total rent of $300 payable in monthly payments of Twenty-five ($25.00) Dollars on the 1st day of each month in advance . . ."; he could not remember who had prepared the written lease. He further testified that the furniture and equipment belonged to him; that of the prescriptions filled by him "maybe 80 or 90 (percent), but a vast percentage of these was Dr. Ross's"; that Dr. Ross's name plate or sign did not appear outside the Venango Street property but rather a flag bearing the words, "Erie 8.75 up Optical"; and in the bay window thereof another sign worded, "Complete glasses, $8.75"; that he has caused to be erected display signs in the neighborhood and advertisements placed in newspapers worded, "Erie 8.75 Optical. Stop paying high prices for glasses. Oculist's eye examination. Same day service. Pay while wearing. Repairs. Broad and Venango Street, one block South of Erie Avenue"; that Dr. Ross does not have his name on any of these advertisements; that Dr. Ross has paid his monthly rentals but there is no record of the transactions in his business records because the entry is to be made at the end of the first annual term of the lease; that he has not fixed Dr. Ross's charge for examination and in no wise interferes with his business. Dr. Ross was not called as a witness.

As to his arrangements with Dr. Saltzman at the North Broad Street office, the latter is on a part-time basis, coming in "at certain times and other times by appointment," using defendant's equipment and pay-

ing no rent for the use of the office and equipment; that he has advertised in the newspapers and on the radio the "Erie $8.75 Optical" business at the North Broad Street and Venango Street addresses. Dr. Saltzman was not called as a witness.

As to his dealings with Doctors Sweeney and Rubin, defendant testified on direct examination and as on cross-examination that it was not his intention to hire an optometrist for the Fifty-second Street store office, but to lease the space to one, and that the advertisement had mistakenly appeared in the "Male Help Wanted" column in the Inquirer, rather than in the "Business Opportunity" column as the result of "a case of cross conversation and misunderstanding".

There are three contentions of counsel for defendant that should be answered preliminarily. One, that because defendant's testimony was that of an adverse party, under cross-examination, his testimony must be taken as true unless it is disproved; second, that because defendant's store at 5 South Fifty-second Street was operated for only "a couple of weeks" and is now closed, his method of operation at that address should be discounted except as it may relate to the manner in which the optical store at Venango Street is conducted; third, that Dr. Saltzman, who makes examinations in the optical store at 2213 North Broad Street, is an oculist or doctor of medicine, and not an optometrist, therefore, whatever defendant's relation with Dr. Saltzman is, defendant cannot be held to be practicing optometry in that shop.

1. That the chancellor is not bound by the uncontradicted statements of defendant that are improbable, is clear. In Matthews v. Derencin et al., 360 Pa. 349 (1948) Justice (now Chief Justice) Stern stated:

". . . Of course, it is true that, as a general proposition, a party calling his opponent as for cross-examination is concluded by his testimony if uncon-

tradicted, but there is an important exception to this rule, namely, that ' "There may be such a degree of improbability in the statements themselves as to deprive them of credit, however positively made". . . . And the witness "may be contradicted by circumstances as well as by statements of others contrary to his own, . . . It cannot be said, as a matter of law, that the jury is bound to accept evidence as true, although not contradicted by direct evidence. Thus, where there is some intrinsic improbability in the statements of the witness, . . . the jury may reject his testimony as incredible, although he is not impeached or contradicted by direct evidence." ' " (Cases cited.)

2. It is equally clear that the chancellor cannot disregard the operation of defendant's store at 5 South Fifty-second Street, for defendant, by his own testimony evidenced his intention to establish the same kind of business arrangement at the Fifty-second Street store as existed at Venango Street. He testified as follows:

"Q. And subsequently you opened the Fifty-second Street office. Why didn't you seek to rent space in the Fifty-second Street to an optometrist rather than seeking to hire one?

"A. That's what I had in mind. I didn't want to hire one. I had in mind the same situation that exists at Venango Street."

Moreover, the amount of time the Fifty-second Street store was in operation is of no moment. As a business enterprise, it tends to establish a pattern or a course of conduct on the part of defendant, important in the determination of the prayer of this bill.

3. Defense counsel's third proposition that because Dr. Saltzman is a medical doctor, defendant's business relationship with him is not a matter for the chancellor to consider, is without merit. The field of optometry

embraces not only the duly licensed doctor of optometry, but also medical doctors, oculists and ophthamologists, who specialize in examination of the human eye and the analysis of ocular functions, . . . by any means or methods other than the use of drugs or surgery. (See the Act of March 30, 1917, P. L. 21, as amended, August 17, 1951, supra.)

From the language of the courts in an overwhelming majority of jurisdictions whenever a problem similar to the one here before the chancellor has arisen, it is apparent that very weighty consideration must be given to the personal nature of an optometrist's services. A recognition that it is in the highest interest of the public to retain the individuality of service in professional pursuits has resulted in statutory enactments throughout the country, founded on the police power of a state to protect the health and safety of its citizens from exposure to harm from untrained and incompetent persons through proper legislative actions. Our legislators, by the Act of March 30, 1917, P. L. 21, 63 PS §§231-244, and its subsequent amendments, have sought to regulate the practice of optometry in such a way that only the well-qualified will be entrusted with the eye care of our citizens.

The definition of optometry as contemplated in the regulating statute of 1917, has been enlarged by amendment, August 17, 1951, P. L. 1280, sec. 1, to read as follows:

"The practice of optometry is hereby defined to be the employment of any means or methods, other than the use of drugs or surgery, for the examination of the human eye and the analysis of ocular functions, or the prescribing, providing, furnishing, adapting or employing any or all kinds and types of lenses and prisms, visual training orthoptics, ocular exercises, and any and all preventive and corrective methods for the aid, correction or relief of the human eye, its asso-

ciated structures, appendages and functions, other than the use of drugs or surgery.

"The term 'optometrist' means a person who practices optometry in accordance with the provisions of this act."

The Act of 1917, supra, (as amended), provides for the licensing of individuals as optometrists, after compliance with certain personal and educational standards, including three years of graduate study beyond the four-year college course; and, also provides for the licensing of qualified optometrists, and penalties for unauthorized practice. The Act states:

"On and after January first, one thousand nine hundred and eighteen, it shall not be lawful for any person in this Commonwealth to engage in the practice of optometry or to hold himself out as a practitioner of optometry, or to attempt to determine by an examination of the eye the kind of glasses needed by any person, or to hold himself out as a licensed optometrist when not so licensed, or to hold himself out as able to examine the eyes of any person for the purpose of fitting the same with glasses, excepting those hereinafter exempted, unless he has first fulfilled the requirements of this act, and has received a certificate of licensure . . . nor shall it be lawful for any person in this Commonwealth to represent that he is the lawful holder of a certificate of licensure, such as is provided for in this act, when, in fact, he is not such lawful holder. . . . Any person violating the provisions of this section shall be deemed to be guilty of a misdemeanor, and shall upon conviction be subject, upon his first offense, to a fine of not more than five hundred dollars, or imprisonment for not more than six months in the county prison, or both or either, at the discretion of the court; . . ."

That the action of our legislature parallels the action taken in a large number of States is evident

from the number of cases in various jurisdictions that have designated optometry as a profession in which the unqualified may not engage. Some of these cases are: Funk Jewelry Co. v. State ex rel. La Prade, (1935), 46 Ariz. 348, 50 P. 2d 945; State ex rel. Beck, Atty. Gen., v. Goldman Jewelry Co., Supreme Court of Kansas (1935), 51 P. 2d 995; Seifert v. Buhl Optical Co. (1936), 276 Mich. 692, 268 N. W. 784; McMurdo v. Getter (1937), Mass. Adv. Sh. 1355, 10 N. E. 2d 139; Kendall v. Beiling (1943), 295 Ky. 782, 175 S. W. 2d 489; State ex rel. Standard Optical Co. v. Superior Court (1943), 17 Wash. 2d 323, 135 P. 2d 839; State ex rel. Loser v. National Optical Stores Co. (1945), 189 Tenn. 433, 225 S. W. 2d 263; State ex rel. Sisemore v. Standard Optical Co. of Oregon (1947), 182 Ore. 452, 188 P. 2d 309; Sears, Roebuck & Co. v. State Board of Optometry (1952), Supreme Court of Mississippi, 57 So. 2d 726.

Our Supreme Court met the issue squarely in Neill et al .v. Gimbel Brothers, Inc., 330 Pa. 213 (1938). In directing that defendant corporation be specifically prohibited from employing licensed optometrists to examine the eyes of its customers, the court quoted from McMurdo v. Getter, supra:

" '. . . The rule is generally recognized that a licensed practitioner of a profession may not lawfully practise his profession among the public as the servant of an unlicensed person or a corporation; and that, if he does so, the unlicensed person or corporation employing him is guilty of practising that profession without a license. . . . As to optometrists, there seems to be a conflict of authority. Undoubtedly the fitting and sale of eyeglasses began as a trade and not as a profession. There is some support in decided cases for the proposition that it must remain a trade, in which an unlicensed person or a corporation may engage as of right, provided the actual work is done by

a skilled servant duly licensed: [Cases cited] . . . The considerations to the contrary seem to us more weighty. . . . The work of an optometrist approaches, though it may not quite reach, ophthalmology. The learning and the ethical standards required for that work, and the trust and confidence reposed in optometrists by those who employ them, cannot be dismissed as negligible or as not transcending the requirements of an ordinary trade. We cannot pronounce arbitrary or irrational the placing of optometry on a professional basis. This conclusion finds support in other jurisdictions. [Cases cited].' "

We think it well to point out that in the Neill case, supra, plaintiff-appellants did not contend that defendants did not have power to lease a portion of their store to professional men for professional purposes; they did submit that when the leasing was accompanied by such control of the lessor' that the professional man became in fact an agent for the lessor, then defendant was doing something indirectly that he could not do directly.

The defendant here before the chancellor readily admits that he has not the qualifications either educationally or legally to practice optometry. It is his contention that he is merely engaged in the operation of an optical store, which requires no special qualifications, and needs no special license for pursuance of the business. He has told the chancellor that he leases a part of one of his stores to a licensed optometrist as an operation independent of his optical business.

From the findings of fact here made, the chancellor must conclude that defendant Chaby, through his conduct of his optical business, was actually engaged in the practice of optometry, contrary to statutory regulations.

Defendant has two optical stores in Philadelphia. In each of them there is a qualified optometrist who

examines eyes and prescribes glasses for customers. Defendant testified that he leases space to doctors of optometry, and thereby affords them a business opportunity, and at the same time benefits his optical business because the doctors' customers usually bring their prescriptions to his shop to be filled. Defendant produced a lease, purported to be a lease agreement presently in force between him and Dr. Allan Ross, a licensed optometrist on defendant's premises at 1408 W. Venango Street. Defendant could not remember who had drawn up the lease, nor could he produce any records showing how much rent had been received by him, or when rental payments were made. Moreover, the alleged lessee did not have a key to the premises. A reading of the lease agreement reveals that no particular space was leased to Dr. Ross, but "all that certain such space in the area on first floor of 1408 W. Venango St., Philadelphia, now occupied by Erie Optical Company as shall be designated by the Lessor to the Lessee for examination and refraction . . .". Defendant testified that Dr. Saltzman, an oculist presently associated with him at 2213 North Broad Street does not pay any rent; that he is on a part-time basis. The Bell Telephone directory, dated May 1952, fails to list Dr. Saltzman (whose initials were not made a part of the record) at the North Broad Street address or Dr. Ross at the Venango Street address; likewise, the Bell Telephone Company's classified directory, August 1952, fails to disclose listings for these doctors. There are three physicians named Saltzman listed in the classified directory, at other addresses, but a Dr. Allan Ross does not appear in either telephone directory. Neither of the above-mentioned two doctors were present in court to testify. However, Dr. Gilbert Rubin, a duly licensed doctor of optometry testified that when he became associated with defendant at 5 South Fifty-second Street, there was a guarantee of

$35 per week for part of his time, as an optometrist, and that there was no mention of rent, nor did he pay any rental charge. In addition to his optical stores, defendant has a general store and a launderette business. Defendant testified that for these enterprises an accountant prepares monthly statements; yet, for the income from rentals of space to optometrists, defendant has no accountant, nor any record of monthly income received as rent from optometrists. Dr. Edwin A. Sweeney testified that defendant had proposed a contract to employ him at the Fifty-second Street address, as an optometrist at a guaranteed weekly remuneration of $60 per week. The foregoing circumstances, coupled with the other facts surrounding defendant's conduct of his optical business, leads the chancellor to the inescapable conclusion that defendant did not, in fact, lease his premises, but made them available to doctors practicing optometry associated with him, provided they conducted their business in a manner satisfactory to him. Defendant's exercise of control over the conduct of the doctors' practice constituted the optometrists mere servants, agents and employes of defendant.

Defendant provided equipment, prescription blanks, and a guaranteed weekly income to the doctors of optometry. The name of the optometrist on his premises did not appear on the prescription blanks. When the optometrist did not work as many hours as had been agreed upon, defendant deducted an amount from the weekly guaranteed income, commensurate with time lost. While defendant denies that such a guarantee could constitute a salary, yet, one of defendant's former associate optometrists testified:

"I didn't get the full $35, however, because I didn't come in Friday night, so that was deducted from my salary."

In answer to a question by the court:

"How much did you get?", the witness answered:

"I think the amount was $19 . . . for the number of hours I had to put in, less the number of refractions I had made."

We conclude this was a wage contract comparable to any salary arrangement between employer and employe.

Defendant advertised his optical business extensively in the Philadelphia area; by newspaper and billboard advertisements he kept the name "Erie 8.75 Optical" before the public, without cost to the doctors. Yet, he did not in any way advertise the name of the doctors associated with him. No doctor of optometry had a sign outside defendant's premises, and as a practical matter, it is difficult to consider that the doctors were intent upon establishing a private practice, or they would assuredly have publicized their own names to the extent permitted within the ethics of their profession.

Defendant specifically recommended that optometrists associated with him refrain from applying for branch office licenses. Dr. Gilbert Rubin, who had been associated with defendant Chaby testified:

"Q. Tell His Honor as to how you were going to work, and your compensation, and the hours you were to work?

"A. Well, I explained to him that I had my own business, and I wanted something on a part-time basis. I told him the best time I could come would be in the afternoon, because I had a preference for my own practice over this, especially as far as building up my income. So, he told me that I could work in the afternoons, from 2 to 5, and Friday evening would be the only evening I would be required to work, and I asked pertaining to an office license, knowing that the State board requires one, and I was told the State board

wouldn't look favorably upon it, and for that reason it wasn't necessary to apply for same.

"Q. Who said that?

"A. Mr. Chaby."

While defendant tells the court he was only trying to afford optometrists a good business opportunity, he not only advertised for an optometrist, but when questioned by the newspaper, when his attention was called to the advertisement's being placed in the "help wanted" section of the paper, he allowed it to be so printed. Defendant's assertion that he did not know such a classification would be in error hardly harmonizes with his instruction to the optometrist not to apply for an office license.

There is no direct testimony that defendant specifically told his associate optometrists to charge a $3 examination fee, but there is evidence that he strongly suggested it, and since $3 was the fee consistently charged, we are constrained to find that defendant's suggestion had the force of an order.

Although there is no direct evidence that defendant specifically instructed his associate optometrists concerning the kinds of lenses that should be ground, there is testimony strongly suggesting that there was a course of conduct defendant expected his associate optometrists to follow. Dr. Rubin testified:

"Q. Tell me what, if anything, was discussed about the type of glasses that you were to prescribe?

"A. Well, it was put to me in the form of a suggestion.

"Q. What was it Mr. Chaby suggested?

"A. Mr. Chaby suggested if I wrote a low amount of cylinder prescriptions, it would be all right.

"Q. What effect would that have on the prices?

"A. This effects the price of the lenses, because the lens itself has to be ground with a cylinder. They don't necessarily have to be ground for single vision, but

they run a little bit more money than the spherical lens which has no cylinder, and so there will be a saving of some money in that respect, but the prescription, of course, would not necessarily be a correct prescription for the patient with the elimination.

"Q. Is it part of your duty to determine whether to use a cylinder?

"A. That's my examination; yes.

"Q. What was his suggestion as to that?

"A. He thought I might not do too much harm if I could eliminate the cylinder from the prescription.

"Q. What if anything, did Mr. Chaby tell you about that?

"A. That I should prescribe kryptok lenses as much as possible.

"Q. (By the court) : What do you mean by kryptok?

"A. That is a type of lens which has a curve on the bottom part of the glass. In other words, it is part of the structure.

"Q. (By the court) : What would be the advantage there?

"A. Again, it would be a financial advantage. It is cheaper to have kryptok lenses than the others.

"In a laboratory the cost of the kryptok type of lens is less than the other shape, the cylinder."

That defendant should be prompted to suggest such a course of conduct to a licensed optometrist, pledged to protect and aid the precious eyesight of our citizenry, shocks the conscience of the chancellor. Such conduct on the part of a qualified optometrist is even more reprehensible. It represents a collusive understanding, designed to keep the price of glasses down, but to the detriment of unsuspecting customers.

By advertising to the general public that eyeglasses could be obtained for "8.75 complete", defendant created a false impression. The public, responding to his advertisements would discover they needed a doc-

tor's prescription in order to have their glasses made. The necessity of paying an extra $3 for an eye examination was not within their contemplation. When, however, defendant would suggest they could conveniently receive the necessary examination on his premises, the result was that the customers would visit the optometrist associated with defendant, and in due course defendant would receive the prescription to be filled. While we will not say there was direct deception practiced, it is obvious that the situation constituted a snare for frugal citizens in need of eye care. It is of no matter that the customer paid the optometrist directly for the examination. The effect of defendant's advertising was to draw people in; both defendant and the optometrist associated with him benefited from the operation. The situation deliberately created by defendant Chaby so intertwined with the function of the optometrist, that it in fact constituted one enterprise.

It is the chancellor's well-considered opinion that the strong testimony presented adverse to defendant was very poorly answered, and defendant's failure to produce any positive witnesses, particularly the testimony of the doctors presently associated with him, conclusively supports the finding that defendant was doing indirectly what he could not do directly—practicing optometry.

In State ex rel. Loser, Attorney General, v. National Optical Stores Co., 189 Tenn. 433, 225 S. W. 2d 263, the court was confronted with facts very similar to those in the instant case. The Supreme Court of Tennessee in affirming the decision of the lower court, quoted from the chancellor's opinion, as follows:

" 'The proof in this record shows that the defendant is in the business of making lenses and fitting and selling eye glasses. . . .

" 'The defendant corporation employs, or has an arrangement with a medical doctor in each of its three stores, by which arrangement each doctor occupies a small space or office inside the store building of the defendant. The doctors' names generally do not appear on the front of the store, and are not listed in the telephone directory. These doctors, by arrangement with the defendant, are present during the time the store is open except for perhaps a short lunch period or possibly an afternoon off each week in some cases. The doctors devote their full time, while present at the store, to examining the eyes of customers who are directed to them by the employees of the corporation, and these doctors are guaranteed a fixed minimum weekly income by the corporation.

" 'The doctors charge a fixed examination fee of $2.00 per customer or patient, and after examining the patient's eyes, and writing the prescription, the patient is then ushered back into the sales room of the store where the manager, or an employee of the store, proceeds to sell the patient glasses by showing samples of frames, etc., and, after agreeing with the customer on the type of frame, glasses, etc., and the price, the order for the glasses is sent to Chicago and shipped from there back to the store for the customer.

" 'If in any week the doctor's examination fees from the patients so directed to him by the corporate employees, fails to amount to the agreed stipulated weekly income, a voucher is sent in and a check from the corporation for the difference is paid him.

" 'While, in some instances, the doctors have an ostensible agreement to pay some small amount as rent for the office space occupied, the record shows that they, in fact, do not pay rent. . . .

" 'A careful examination of this entire record, including the advertisements, and pictures which have been made exhibits, the depositions of witnesses and

the testimony heard in open Court, leads the Court to the inescapable conclusion that the plan or device by which defendant uses the services of the medical doctors in question, amounts to an evasion of the law and is not a bona fide arrangement. . . ' "

The Supreme Court then went on to say:

"From these facts, the Chancellor found that no narrow technical definition of the employer-employee relationship should be applied and that in the sense necessary to make the doctors employees of the corporation, practicing their profession for it and in its name, the undisputed evidence force the conclusion that the doctors were such employees and that, therefore, the corporation was practicing optometry."

Defendant has indicated that because this is a class suit and because certain optometrists are engaged in dispensing eye glasses, they are practicing a trade in competition with him, and are acting in violation of their professional standards; that, even though our finding be that he has been in error, such optometrists are also guilty of violation of statutes pertaining to the practice of optometry, and therefore they are entitled to no relief in equity. Sufficient here to say that we can find no statutory violation by plaintiffs, for the law specifically states:

"The practice of optometry is hereby defined to be . . . the prescribing, providing, furnishing, adapting or employing any or all kinds and types of lenses and prisms. . . ."

Therefore, if an optometrist prescribes, then grinds lenses in accordance thereof, and fits his patient with proper glasses, he is merely fulfilling, completely, the function the law has assigned to him.

Plaintiffs have requested that the chancellor find the oculist and the licensed optometrist presently associated with defendant guilty of violation of statutory regulations concerning the practice of optometry. Be-

cause neither of them were joined as defendants in this suit, the chancellor is without authority to reach them upon the legal consequences of their conduct in conjunction with defendant's optical business.

Having concluded that defendant Chaby has been conducting his business in violation of statutory law, we make the following

*Conclusions of Law*

1. Optometry is a profession, the practice of which in Pennsylvania is regulated by the Act of March 30, 1917, P. L. 21, 63 PS §§231-244, as amended.

2. The very purpose of the Act of 1917, as amended, is to protect the public from damages caused by untrained and incompetent persons.

3. The practice of optometry in Pennsylvania without a certificate of licensure is contrary to statutory regulation.

4. Plaintiffs, as duly licensed optometrists, possess a property right which equity will protect by injunction.

5. Defendant possesses neither the necessary qualifications, nor a certificate of licensure, to practice optometry in Pennsylvania.

6. Defendant does not have the right to hold himself out as a licensed optometrist of this Commonwealth.

7. Defendant through his course of conduct in hiring qualified doctors and by his advertising has allowed himself to be held out as a licensed optometrist.

8. Defendant, through the conduct of his business, with associate licensed doctors, has been engaged in the practice of optometry, contrary to the laws of the Commonwealth.

9. The relationship established between defendant and his associate optometrists constitutes one of employment.

10. Defendant's acts, in holding himself out as a licensed optometrist, directly affects and injures the

practice of all licensed optometrists within the City of Philadelphia.

11. Defendant's acts, in holding himself out as a licensed optometrist, directly affects and injures the public who are misled and influenced to act to their detriment upon reliance of his representations.

12. The public has the right to be protected, and the court a duty to protect the public against unauthorized practices in the profession of optometry.

13. Defendant should be permanently enjoined from practicing optometry, either directly or indirectly through servants, agents and employes.

14. Defendant should be enjoined from holding himself out in any form as a licensed optometrist.

15. Defendant should be enjoined from allowing his premises to be used by anyone qualified to practice optometry in such a manner as to vest control of the optometrist's business in defendant.

16. Defendant should be enjoined from entering into collusive agreements with qualified doctors of optometry, where, by his advertising methods, he secures patients for the doctors with the understanding that he will fill the patients' prescriptions.

### Decree Nisi

And now, June 4, 1953, in accordance with the foregoing findings of fact and conclusions of law, it is ordered, adjudged and decreed:

That defendant be enjoined from:

1. Holding himself out to be an optometrist by signs, advertisements, printed or oral, or by any medium whatsoever.

2. Employing an optometrist, oculist or ophthalmologist, to practice for him as his agent, servant, lessee, or concessionaire, whether on or off the premises.

3. Entering into any relationship with any optometrist, oculist, ophthalmologist, or other person, whereby defendant recommends or suggests such optometrist,

oculist, ophthalmologist, or other person to customers in return for any consideration or gratuity, including a counter referral to defendant for the purpose of making glasses.

4. Entering into any conspiracy with any optometrist, oculist, ophthalologist, or any other person, to evade the statute relating to the practice of optometry or medicine.

5. Practicing optometry, either directly or indirectly without a license to so do.

Defendant is to pay the costs.

The Prothonotary is directed to enter this decree nisi and to give notice thereof to the parties or their counsel, and unless exceptions thereto are filed within 20 days thereafter, the decree nisi shall be entered as the final decree, by the prothonotary, as of course.